IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2026 Session

**STATE OF TENNESSEE v. DEMETRUICE BENNETT**

**Appeal from the Criminal Court for Knox County**
**No. 120853          Steven W. Sword, Judge**

─────────────────────────────────

**No. E2025-00599-CCA-R3-CD**

─────────────────────────────────

In 2023, a Knox County jury convicted the Defendant, Demetruice Bennett, of assault, several offenses involving the possession of a weapon and evading arrest. The trial court sentenced the Defendant, a Range II offender, to a total effective sentence of twenty years, to be served at 100%. On appeal, the Defendant contends that: (1) the trial court erred when it admitted a video showing that he possessed a firearm on a day different from the day upon which the indicted offenses occurred; (2) his trial counsel was ineffective for failing to object to the admissibility of the video; and (3) the evidence is insufficient to support his convictions related to his possession of a firearm. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Joshua Hedrick, for the appellant, Demetruice Bennett.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; and Charme P. Allen, District Attorney General; G. Lawrence Dillon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's interactions with his ex-girlfriend, Ukiah Pelcher, while he was in the Walter P. Taylor Homes complex ("Taylor homes"). For his actions, the Knox County grand jury indicted the Defendant[1] on March 3, 2022, for: (Count

───────────────

[1] The indictment referenced the Defendant's aliases "Meat Meat" and "Calipha Ali."

1) Aggravated Assault based on Ms. Pelcher's reasonable fear of imminent bodily injury while he was displaying a deadly weapon; (Count 2) reckless endangerment; (Count 3) unlawfully and knowingly possessing a firearm on September 16, 2021, having been convicted of a felony crime of violence based on his June 17, 2014 conviction for robbery; (Count 4) unlawfully and knowingly possessing a firearm on September 16, 2021 having been convicted of a felony drug offense based on his prior felony convictions for selling marijuana and cocaine on June 28, 2010, and January 10, 2008, respectively; and (Count 5) evading arrest.

Before trial, the Defendant's counsel agreed for trial purposes to stipulate to the fact that the Defendant had a prior felony conviction that prohibited him from possessing a weapon. The court would hold a bifurcated proceeding if the Defendant was convicted, during which the State could attempt to prove the prior felonies were robbery and drug related.

The State asked the court to address the 404(b) issue regarding the video of the Defendant possessing a firearm while on parole. The State explained that it had a parole officer who received a video of the Defendant possessing a firearm that matched the description of the firearm given by the victim. The Defendant said that the defense had known about the video but was unsure how the State intended to introduce it. The video was found as part of a search of the Defendant's phone pursuant to his parole rules, but the parties agreed that the witness introducing the video would simply state that it was found as part of the Defendant's "supervision."

At the Defendant's trial, the parties presented the following evidence: A 911 operator testified regarding the initial call, and it was admitted into evidence. In it, Ms. Pelcher called 911 and said that she was out walking in the Taylor homes neighborhood with her friend, when the Defendant, whom she knew from having a past relationship with him, came down a walkway with a weapon. She described the weapon as "brown and black" with an extended clip. Ms. Pelcher offered a description of the Defendant and his clothing and estimated that he was about thirty years old. She said that she told the Defendant that he should not have the weapon out because there were women and children present, and too many women and children had already died to gun violence that year. The Defendant told her to "Shut the f**k up."

During the call, Ms. Pelcher appeared to be speaking with the Defendant and informed him that she was on the phone with the police. She yelled to someone in the background that all she told him was that he should not have a gun around women and children. She repeatedly told the person in the background that the police were on their way. Ms. Pelcher said that the Defendant turned the gun on her.

2

Officer Austin Jordon, an officer with the Knoxville Police Department ("KPD") testified that the Taylor homes included several apartment buildings and was in a well-lit area near a Boys & Girls Club. On September 16, 2021, Officer Jordon responded to a call from that area, and he was fitted with an operable body camera at the time.

The State introduced the body camera footage, which showed Ms. Pelcher discussing the situation with Officer Jordon. She said that the Defendant, whom she identified by name, came from a nearby walkway holding a gun. The gun was brown and black with an extended clip, and the upper slide portion of the gun was brown. Ms. Pelcher admonished the Defendant for brandishing a weapon when there were women and children present. The Defendant became incensed and told her that it was not her business. He never pointed the weapon at Ms. Pelcher, but he said, "I'll shoot you bitch."

Officer Jordon continued his investigation and learned that neither the Defendant nor Ms. Pelcher listed their address as in the Taylor homes. He also filed the necessary paperwork to obtain a warrant for the Defendant's arrest.

During cross-examination, Officer Jordon agreed that he did not interview anyone else regarding this incident. He explained that, after speaking with Ms. Pelcher, he circled around to look for the Defendant. Upon not seeing him, he returned and everyone had gone inside.

Ms. Pelcher testified that she had grown up in the Taylor homes and that she had a daughter who currently resided there. Additionally, Ms. Pelcher was part of a committee that held a homecoming there every year. She said she was often in the community doing activities but was not a current resident.

Ms. Pelcher recalled this incident, which occurred at around 11:00 p.m. She said that she knew the Defendant because the two were romantically involved in 2013. The two parted ways when the Defendant was incarcerated. Ms. Pelcher described this incident saying that she was in the Taylor homes on September 16, 2021, standing in a circle with some residents. One of the women present was accompanied by her grandson. The Defendant came around a corner, and Ms. Pelcher's friend's grandson "took off running" and screaming, "Meat, Meat, Meat gun, Meat Meat."

Ms. Pelcher said that she and the other women with her ran towards the Boys & Girls Club. The Defendant and the man that he was with, whom he appeared to be threatening with a gun, had a conversation and then ended their conversation. Seeing that the conversation was over, the women returned. Ms. Pelcher and the other women asked the Defendant why he would approach the area with a gun when there were children right there. One of the women smacked the Defendant.

Ms. Pelcher said that when she admonished the Defendant, he said "B***h, you ain't got nothing to do with it. Boo, boo, boo, boo. I shoot you." This started an argument. Ms. Pelcher said she called 911 because the Defendant had a gun, and she was afraid. While he did not point the gun directly at her, she was still afraid.

During cross-examination, Ms. Pelcher agreed that she knew that the Defendant had a gun before she ran towards the Boys & Girls Club. She did not call 911 at that point. When the conversation between the two men ended, the women went back towards the Defendant and confronted him about why he would bring a weapon into the area with women and children present. Ms. Pelcher said that it was then that the Defendant said, "B***h, you ain't got nothing to do with it," as he moved the weapon from his side pocket and held it at his side, but still did not point it directly at her. He did tell her that he was going to shoot her in her face. She responded to him saying that he was not going to shoot her in the face in front of all these people, and she was calling the police.

Later, as soon as the police arrived that night, the Defendant contacted Ms. Pelcher by messenger through her Facebook page. His Facebook page was registered to "Calipha Ali," but had his own picture. The messages between the two read:

[Defendant] B***h next time I see u yo junkie ass ima shoot you.

[Ms. Pelcher] F[a]r from a junkie but thanks for the treat tho.

[Defendant] Yea aight
Lil dusty ass b***h u da police and u Goin lie and say I pull a gun out on a a child… tf wrong with you pill head ass hoe I got you.

A probation and parole officer testified that she was supervising the Defendant in this case. She said that she received a video of the Defendant from June or July of 2021 that she saved. The video was introduced and it appeared to be self-recorded by the Defendant and posted to his Facebook stories. It showed him holding a black and brown handgun with an extended clip.

During cross-examination, the probation and parole officer testified that the video was anonymously sent to her State-issued cell phone. She did not speak with the Defendant about the video because at that point in time he was not in compliance with supervision.

Sean Ford, a KPD officer, testified that he prepared a search warrant for the Defendant's Facebook records. Those records indicated that the Facebook profile for

4

"Calipha Ali," identified the Defendant by name. The records also confirmed that he sent a message at 11:41 p.m. on September 16, 2021, to Ms. Pelcher.

Officer David Chandler with the KPD testified that he was present at the time of the Defendant's arrest on September 18, 2021. Officer Chandler went with two other officers at 7:20 p.m. to arrest the Defendant. He was assigned to watch the back of the house in case the Defendant left the house at the back. The other officers went to the front of the house, knocked, and spoke with someone inside. While they were at the front of the house, Officer Chandler saw the Defendant running out of the house through the side yard. The officer pursued him through an alley, cut through a yard, went up two streets, and arrested him in a house nearby.

The parties entered the stipulation that "On September 16th , 2021, the [D]efendant . . . had a prior felony conviction that prohibits him from possessing a firearm."

The Defendant called Aliyah Stone who testified that she and the Defendant were dating at the time of this incident. Ms. Stone drove the Defendant to the Walter P. Taylor homes on the night he was arrested and parked her car in the area. The Defendant exited her vehicle, went into an apartment, and was gone for approximately forty-five minutes. She got tired of waiting, so she got out of the car and saw that the Defendant was still in the apartment. She knocked on the apartment door, and the Defendant and another man, "D. Penson," came out and were arguing. Ms. Stone told the Defendant it was time to leave, and he and D. Penson, who had ceased their argument, walked with her towards the car.

Ms. Stone said that Ms. Pelcher came toward them and started "talking stuff," so the Defendant and Ms. Pelcher started arguing. Ms. Stone told the Defendant to "come on," and he got into her vehicle with her, and they left. Ms. Stone said that the Defendant did not have a gun with him at the time, and she never saw him with a gun.

During cross-examination, Ms. Stone said that, while she did not recall specifically, it might have been 8:00 p.m. or so when she and the Defendant went to the apartments and that they stayed forty-minutes. Learning that this incident occurred at around 11:00 p.m., she said that she was unsure what time she and the Defendant were at the Taylor homes.

At the conclusion of this evidence, the jury convicted the Defendant of the lesser-included offense of assault in Count 1, not guilty of reckless endangerment in Count 2, guilty of evading arrest in Count 5. The jury found the Defendant unlawfully possessed a weapon.

The trial court proceeded to a bifurcated trial regarding the weapon possession charge, during which the State presented the following evidence. The State entered certified copies of the Defendant's previous convictions that involve the possession with intent to sell marijuana, a Class E felony, and the possession with intent to sell 0.5 grams or less of cocaine, a Class C felony, and aggravated robbery, a Class C felony.

Based upon this evidence and after the arguments of counsel, the jury convicted the Defendant in Count 3 of unlawfully and knowingly possessing a firearm on September 16, 2021, having been convicted of a felony crime of violence based on his June 17, 2014 conviction for robbery and in Count 4 of unlawfully and knowingly possessing a firearm on September 16, 2021, having been convicted of a felony drug offense based on his prior felony convictions for selling marijuana and cocaine on June 28, 2010, and January 10, 2008, respectively.

The Defendant filed a motion for new trial, and the following evidence was presented at the hearing. Counsel testified that, for strategic reasons, he did not object to the admission of the video that showed the Defendant dancing while holding a gun. He explained that the gun that Ms. Pelcher described the Defendant as having was the same as the gun in the video. Counsel argued that Ms. Pelcher knew about the video, had seen the video, and was lying about the Defendant having a gun in the Taylor homes, and that she was simply describing a gun that she had seen him with in the video shared on social media.

The trial court said that it was his impression that the jury found that the Defendant had a gun the night of the incident with Ms. Pelcher but that he never really threatened her with it. The trial court then filed a written order; its findings are discussed below. Thereafter, the trial court denied the Defendant's motion for new trial.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it admitted a video showing that he possessed a firearm on a day different from the day upon which the indicted offenses occurred; (2) his trial counsel was ineffective for failing to object to the admissibility of the video; and (3) the evidence is insufficient to support his convictions related to his possession of a firearm.

### A. Firearm Video

The Defendant asks us to review whether the trial court erred when it admitted a video showing that he possessed a firearm on a day different from the day upon which the

indicted offenses occurred pursuant to the plain error doctrine. The State counters that the Defendant cannot prove the elements required for us to review the issue for plain error.

Our supreme court has recognized that "[u]nlike plenary review, which applies to all claims of error that are properly preserved, plain error review is limited to those errors which satisfy five criteria." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2019). These criteria are as follows:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. The "defendant bears the burden of establishing all of these elements." *State v. Linville*, 647 S.W.3d 344, 354 (Tenn. 2022). As such, an appellate court "need not consider all of the elements when it is clear from the record that at least one [of] them cannot be satisfied." *State v. Reynolds*, 635 S.W.3d 893, 931 (Tenn. 2021). "Whether the plain error doctrine has been satisfied is a question of law which we review de novo." *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015).

Before an error may be recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *Adkisson*, 899 S.W.2d at 639. Plain error review applies only to errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). The error must be "of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642. Because of this demanding standard, "[o]nly rarely will plain error review extend to an evidentiary issue." *State v. Haymer*, 671 S.W.3d 568, 578 (Tenn. Crim. App. 2023) (citation omitted).

We now turn to determine whether the trial court breached a clear and unequivocal rule of law when it allowed the State to admit the video of the Defendant with a gun. Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be

7

excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). This Court finds an abuse of discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining."" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

We conclude that the trial court did not breach a clear and unequivocal rule of law by allowing the State to admit the video of the Defendant possessing a weapon on a previous occasion. The Defendant can be seen in the video holding a black and brown weapon with an extended clip. This was relevant to show that the Defendant had at one point possessed, and that he had access to, a weapon that matched the weapon described by Ms. Pelcher. The trial court instructed the jury that it was only to consider whether the Defendant possessed a weapon on the date of the offense in the indictment, not the incident in the video which occurred a couple of months earlier. The trial court did not apply an incorrect legal standard or reach an illogical or unreasonable conclusion by admitting the video. Because the Defendant cannot prove that the trial court breached a clear and unequivocal rule of law, he is not entitled to plain error review.

## B. Ineffective Assistance of Counsel

The Defendant next contends that his trial counsel was ineffective for failing to object to the admissibility of the video. The State counters that the Defendant is not entitled to post-conviction relief because Counsel made a strategic decision not to object to the video and because the Defendant cannot show prejudice.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A petitioner has the burden of proving his factual allegations by clear and convincing evidence. Id. § 40-30-110(f) (2025). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail on an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). In *Rogers v. State*, this court stated the following about defense counsel's strategic decisions: "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." No. M2010-01987-CCA-R3-CD, 2012 WL 3776675, at *35-37 (Tenn. Crim. App. Aug. 30, 2012), *perm. app. denied* (Tenn. Dec. 11, 2012). This deference, however, only applies "if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In his brief, the Defendant states that Counsel's strategy "for not objecting to the evidence of the prior gun possession was to highlight that the gun in the video was a different gun." Reviewing his citation to the record, and the record in its entirety, however, this is wholly inconsistent with Counsel's purported strategy. In the citation offered by the Defendant's brief, which is taken from the motion for new trial hearing, Counsel described his strategy in not objecting by saying:

9

[T]he strategy . . . was to get the jury to believe that [Ms. Pelcher's] describing a gun that she believe[d] [the Defendant] had previously. . . . [S]he is making up [that he had a weapon on the night of their interaction by] taking what . . . she knows is out there for real, and she's saying she saw the same thing the night of the incident.

During the hearing, the Defendant's counsel acknowledged understanding what Counsel was saying: "I understand. Essentially, she's lying about what she saw and she's . . . using this video to do it." Counsel's purported strategy was never to say that there were "different guns" but rather to say that Ms. Pelcher was lying about seeing the Defendant with a gun on the night she called police, that the Defendant never had a gun that night, and that Ms. Pelcher was using the a gun that she saw the Defendant have in a video on social media to bolster her lie.

In both Counsel's opening and closing statements, he argued that the Defendant did not have a gun the night of his interactions with Ms. Pelcher. He contended that Ms. Pelcher had a vendetta against the Defendant based on a previous relationship with him and that she calmly told police that he had a gun and she described a gun that she had seen him with on a social media post. Counsel called into question Ms. Pelcher's credibility and her ability to see the weapon given the dark conditions. He noted that in Facebook messages sent immediately following the incident, the Defendant asked Ms. Pelcher why she would lie and say that he pulled a gun out on a child. Counsel implored the jury to find the Defendant not guilty of aggravated assault or possessing a weapon. He concluded: "The big concern is Ms. Pelcher taking the description of . . . that gun in the video . . . which we have no idea when it was [taken] . . and unprompted describing that exact same gun to the 911 [operator]."

The Defendant's brief notes that "the trial court made a factual finding that the video was relevant 'to the material issue of whether the Defendant owned the same firearm around the time of the alleged offense.'"[2] Further, the trial court's finding that the gun in the video was the same gun in the alleged offense precludes a finding that it was a sound trial strategy to try to show the jury that these were two different guns.

Again, Counsel's purported strategy was to say that the Defendant did not have a gun at all on the night of this incident and that Ms. Pelcher was describing a gun that she had seen the Defendant have in his possession on social media. The Defendant's counsel

---

[2]The Defendant cites Vol V. at 64. Volume V does not have a page 64, and it appears he is relying on a finding made by the trial court when it denied his motion for new trial. See Volume 1 page 64.

noted Ms. Pelcher's calm demeanor when speaking with the 911 operator. She seemed unconcerned that the Defendant had a gun and, in fact, was repeatedly yelling back at him telling him she was on the phone with police. Counsel's argument was that her demeanor did not comport with that of someone facing a man holding a weapon. He argued that the Defendant did not have a weapon on the night of the incident.[3]

We conclude that the trial court did not err when it found that Counsel's strategy was not so "ill-chosen" that it permeat[ed] the entire trial with obvious unfairness." *Rogers*, 2012 WL 3776675, at *36. Counsel's strategy was sound. He clearly attempted to prove that Ms. Pelcher was not credible, and that she had a vendetta against the Defendant based on a past relationship. He argued that her demeanor demonstrated that the Defendant did not have a gun on the night of the alleged offense. He explained her precise description of his gun, despite the dark conditions, was because she had seen a video on social media in which the Defendant held a similar weapon. We conclude that Counsel was not ineffective in this regard.

Further, the Petitioner cannot show prejudice. The trial court found that the video of the Defendant with a gun was relevant to the State's case in chief. The State sought to prove that the Defendant did, in fact, have a gun on the night in question and that it was the same gun that he was seen with on a social media video. The trial court found that the video was relevant to whether the Defendant had access to a similar firearm around the time of the alleged offense. The video, it said, was clear and convincing evidence of this and the probative value substantially outweighed the danger of unfair prejudice. The trial court said that it would have admitted the video over any objection lodged by the Defendant. Accordingly, the Defendant is not entitled to post-conviction relief based upon ineffective assistance of counsel.

## C. Sufficiency

The Defendant contends that the evidence is insufficient to support his convictions related to his possession of a firearm. He asserts that the only evidence that he possessed a weapon was Ms. Pelcher's testimony. By its verdict rejecting aggravated assault and convicting the Defendant of the lesser-included offense of assault, the jury rejected that

---

[3]It appears that the trial court explained Counsel's reasoning for not objecting to be so that he could argue that the gun in the video did not match Ms. Pelcher's description, so they were different guns. This was not, however, the reasoning offered by Counsel at the hearing, and it was not the argument he made before the jury. Counsel posited in both instances that the Defendant did not have a gun with him at all on the night of the alleged offense and that Ms. Pelcher simply described a gun that she knew that the Defendant had on a previous occasion in the social media video.

Ms. Pelcher was in fear of the Defendant. The State counters that the jury correctly found that it proved each element of the charged offenses beyond a reasonable doubt.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally

insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

At the conclusion of all the evidence in the bifurcated proceeding, the jury convicted the Defendant in Count 1 of the lesser-included offense of assault; in Count 3 of unlawfully and knowingly possessing a firearm on September 16, 2021, having been convicted of a felony crime of violence based on his June 17, 2014 conviction for robbery; in Count 4 for unlawfully and knowingly possess a firearm on September 16, 2021 having been convicted of a felony drug offense based on his prior felony convictions for selling marijuana and cocaine on June 28, 2010, and January 10, 2008, respectively; and in Count 5 of evading arrest. The Defendant only contests the two firearm charges, contending that Ms. Pelcher's testimony was not credible and that the jury by its verdict of assault showed that it did not find her credible.

A person commits assault when he intentionally, knowingly, or recklessly causes bodily injury to another, or intentionally or knowingly causes another to reasonably fear imminent bodily injury. T.C.A. § 39-13-101(a)(1), & (2). "The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." *State v. Whitfield*, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998) (citing *State v. Pittman*, No. 03C01-9701-CR-00013, 1998 WL 128801, at *5 (Tenn. Crim. App. Mar. 24, 1998), no Tenn. R. App. P. 11 application filed), *perm. app. denied* (Tenn. Dec. 7, 1998).

The jury clearly found that Ms. Pelcher's testimony that the Defendant possessed a firearm was credible. "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. It did not, however, believe that he used that firearm to endanger anyone recklessly or put Ms. Pelcher in fear with the weapon. It appears that the jury believed that the Defendant had the weapon, and that Ms. Pelcher saw that he had that weapon, but that he did not threaten her with it and simply possessed it. The jury further found that the Defendant telling Ms. Pelcher that he would shoot her, although not pointing the weapon at her, caused Ms. Pelcher to reasonably fear imminent bodily injury. The Defendant followed up his interactions with Ms. Pelcher with a Facebook message in which he said, "B***h next time I see u yo junkie ass ima shoot you." The jury believed that the Defendant threatened to shoot Ms. Pelcher and that she was reasonably in fear of imminent bodily injury. The evidence is sufficient to support this finding and the Defendant's assault conviction, and the evidence is also sufficient to support the jury's finding that the Defendant possessed a weapon on the night of the assault.

### III. Conclusion

Based on the foregoing reasoning, the trial court's judgments are affirmed.


s/ *ROBERT W. WEDEMEYER*
ROBERT W. WEDEMEYER, PRESIDING JUDGE